# UNITED STATES DISTRICT COURT

### SOUTHERN    DISTRICT OF    CALIFORNIA

ORDERED SEALED BY COURT    UNSEALED 12 OF

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

**1621 Montgomery Drive**
**Vista, California**

DEPUTY

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

### CASE NUMBER:    07 MJ 2743

I, __John Gieson__, being duly sworn depose and say:

I am a(n) __Special Agent with the Drug Enforcement Administration__ and have reason to believe that

___ on the person of or __XX__ on the property or premises known as (name, description and/or location)

**1621 Montgomery Drive, Vista, California** *(Attachment A)*

in the _____ SOUTHERN _____ District of _____ CALIFORNIA _____
there is now concealed a certain person or property, namely (describe the person or property)

**See Attachment B**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of the commission of a criminal offense concerning violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 1956.

The facts to support a finding of Probable Cause are as follows:

**See Attached Affidavit.**

Continued on the attached sheet and made a part thereof:    X   Yes   ___ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

__11/21/07__   at   __San Diego, CA__
Date                 City and State

__Jan M. Adler__ _____
Name and Title of Judicial Officer    Signature of Judicial Officer
US Magistrate Judge

**AFFIDAVIT IN SUPPORT OF APPLICATION OR SEARCH WARRANT**

I, John J. Gieson, being duly sworn, declare and state:

**I**

**BACKGROUND AND EXPERIENCE**

1.      I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration (DEA) and have been so employed since September 1998. I am presently assigned to the San Diego Field Division, Narcotic Task Force Team 6 (NTF), and have been so since April 1999. I have received formal training in illicit controlled substance investigations in San Diego County and surrounding areas. I have had formal training and experience in controlled substances investigations; I have become familiar with the manner in which controlled substance investigations, including marijuana, are packaged, marketed, cultivated and consumed. I have received training in the identification of all types of controlled substances by sight and odor, including marijuana. I have participated in hundreds of arrests for controlled substances violations. In the course of my present duties, I have become familiar with the manners and techniques of traffickers in controlled substance as practiced locally. I have served or assisted in the service of over 100 search warrants wherein all types of controlled substances, including marijuana, were seized.

2.      In January 1999, I completed a 17-week Basic Agent's School at the FBI Academy in Quantico, Virginia, which included training in the manufacture, cultivation, distribution, and abuse of all types of controlled substances. In April 2000, your affiant completed the 2-week Clandestine Laboratory Investigation Course at the FBI Academy in Quantico, Virginia, which was conducted by DEA. Your affiant has received more than 100 hours of instruction in conducting indoor/outdoor cannabis investigations. Currently, your affiant serves as DEA's San Diego Division, Domestic Cannabis Eradication/Suppression Program Coordinator. Your affiant is responsible for coordinating the marijuana eradication efforts in San Diego and Imperial Counties. Your affiant has personally assisted in the eradication of more than 300,000 marijuana plants. Your affiant has also performed the following duties: (1) acted as case agent organizing drug investigations; and (2) debriefed numerous informants and defendants regarding marijuana cultivation and distribution.

3.      In preparing this affidavit, I have conferred with other special agents and law enforcement officers who have experience conducting investigations regarding the cultivation of marijuana.  Furthermore, I have personal knowledge of the following facts or have been informed of them by others.

## II

## LOCATIONS TO BE SEARCHED

4.      This affidavit is submitted solely for the purpose of establishing probable cause to scan each premises located at   (1) 1621 Montgomery Drive, Vista, California (hereinafter **"1621 Montgomery Drive"**); (2)3220 Gopher Canyon Road, Vista, California (hereinafter **"3220 Gopher Canyon Road"**); (3) 10241 Eagle Rock Avenue, San Diego, California (hereinafter **"10241 Eagle Rock Avenue"**); and (4) 8539 Aquarius Drive, San Diego, California (hereinafter **"8539 Aquarius Drive"**), including all attached and unattached rooms, attics, basements, garages (including vehicles parked therein), storage areas, safes, briefcases, containers, trash areas within the residence, surrounding grounds and outbuildings assigned to or part of to these four locations. The locations are further described in Attachment A.

5.      This affidavit does not contain all of the information known to law enforcement regarding this investigation, but rather contains only those facts believed to be necessary to establish probable. cause to search the locations listed above in paragraph 4.  Based upon my training and experience, my review of documents and other relevant information I believe to be reliable, witness interviews, and discussions with other agents from the DEA, the United States Internal Revenue Service ("IRS"), I submit that the facts contained in this affidavit demonstrate that there is probable cause to believe that evidence of violation of Title 21, United States Code, Sections 841(a)(1)/846 and 841(a)(1) (manufacture of a controlled substance, to wit, marijuana and marijuana plants) and Title 18, United States Code, Section 1956 (money laundering), including items listed in Attachment B, will be found at: (1) **1621 Montgomery Drive**; (2) **3220 Gopher Canyon Road**; (3) **10241 Eagle Rock Avenue**; and, (4) **8539 Aquarius Drive**.

2

### III.

### FACTS ESTABLISHING PROBABLE CAUSE

### BACKGROUND OF INVESTIGATION

7.      In June 2007, your affiant interviewed a Source of Information (SOI) who related that an individual named Seth Venskus (hereinafter "Venskus") was known to grow marijuana indoors. The SOI believed that Venskus lived in San Marcos, but had heard through mutual acquaintances that the indoor grow house was possibly in the Mira Mesa or Clairemont areas of San Diego. The SOI previously purchased personal amounts of marijuana from Venskus. The SOI was not aware of where Venskus currently resided and did not know the specific location of where Venskus grew and manufactured marijuana. SOI is not a percipient witness to Venskus' marijuana grows.

8.      The SOI is currently facing charges in an open criminal prosecution, but has agreed to cooperate with law enforcement. No promises have been made to the SOI in exchange for her/his cooperation other than the amount and degree of the cooperation will be made known to the prosecutor, who may then be inclined to recommend some kind of sentencing consideration. The SOI has entered a guilty plea in federal court to manufacturing marijuana plants (an offense that is a 5-year minimum mandatory) and is awaiting sentencing. Despite these pending charges, I believe the SOI information is accurate because the information given to me was corroborated by other law enforcement sources and me.

9.      I desire to keep the SOI confidential because she/he has requested me to do so; because it is my training and experience that such SOI's suffer physical, social or emotional retribution when their identities are revealed; because it is my experience that to reveal the identity of such SOI's seriously impairs their utility to law enforcement; and because it is my experience that revealing the identity of such SOI's dissuades other citizens from disclosing confidential information about criminal activities to law officers. The SOI is not a percipient witness of any of the events.

10.      Pursuant to the information from the SOI, I subsequently queried Venskus' name into a law enforcement database and learned Venskus' name had been previously entered by San Diego County Sheriff's Detective Tim Dinger. I spoke to Detective Dinger, who told me that in August 2006, he received a citizen's complaint of possible narcotic activity taking place at 337 Morgan Place, Vista,

3

California (hereinafter "337 Morgan Place"). He spoke to the citizen who told him he/she believed that Seth Venskus was possibly selling narcotics out of the residence of 337 Morgan Place. The citizen further provided Detective Dinger with multiple California license plates that the citizen believed were involved with the narcotic activity. Detective Dinger investigated the information but was not able to develop any actionable leads.

## 1621 MONTGOMERY DRIVE INVESTIGATION

11.    I reviewed subpoenaed records from San Diego Gas & Electric (hereinafter "SDG&E") which show that Seth Venskus is the current utility subscriber at **1621 Montgomery Place**, and has been since April 1, 2007.

12.    The following table shows the electrical usage history, in kilowatt-hours per month, at **1621 Montgomery Drive**, along with four comparable neighborhood residences. I have personally seen these residences used for comparison purposes in the neighborhood and they appear to be similar in size and construction to the residence at **1621 Montgomery Drive**.

### AMOUNT OF KILOWATTS UTILIZED

| DATE | **1621 Montgomery** | XXX Montgomery | XXX Montgomery | XXX Montgomery | XXX Montgomery |
|---|---|---|---|---|---|
| 10/07 | 1776 | 294 | 235 | 477 | 661 |
| 09/07 | 1578 | 649 | 264 | 500 | 818 |
| 08/07 | 2250 | 1133 | 202 | 505 | 710 |
| 07/07 | 2311 | 1198 | 249 | 505 | 627 |
| 06/07 | 2478 | 685 | 320 | 593 | 726 |
| 05/07 | 2257 | 563 | 252 | 422 | 609 |
| 04/07 | 1515 | 406 | 260 | 462 | 633 |

13.    Based on my training and experience, it is my opinion that the electrical usage at **1621 Montgomery Drive** shows high energy use that is consistent with the amount of electricity required to operate the equipment commonly used for indoor marijuana cultivation, namely, but not limited to, high wattage lights, circulation fans, exhaust blowers, and pump systems. I observed nothing from the

outside of the structure that could lead me to account for the high electrical usage.

14.    On August 9, 2007, a magnetic Global Positioning System (GPS) vehicle tracker was placed on a 1999 Ford F-250 pick-up truck bearing California license plate 7L21211, registered to Venskus at 337 Morgan Place (hereinafter "Venskus' truck"). The GPS tracker was placed on Venskus' truck while it was parked in the drive way of 337 Morgan Place. Subsequent battery changes of the magnetic GPS vehicle tracker took place while Venskus' truck was parked in a public place or in the driveway of his residence at 337 Morgan Place. The driveway entrance to 337 Morgan Place is not gated and there is no signage denoting "no soliciting" or "no trespassing."   The GPS tracker on Venskus' truck shows that Venskus likely resides at 337 Morgan Place because the truck returns to the address every night.  However, the GPS tracker also shows that Venskus' truck frequently travels to the area of **1621 Montgomery Drive**, which I believe is a marijuana grow location as further discussed below, and would eventually return to 337 Morgan Place.  When conducting physical surveillance in conjunction with the GPS tracker, on multiple occasions,  I and other agents have observed Venskus driving his truck.  Below is a chart depicting information received from the GPS tracker on Venskus' truck demonstrating that he frequently travels to the areas of **1621 Montgomery Drive** as well as **3220 Gopher Canyon Road** [1] which I believe is a marijuana grow location as further discussed below.

| MONTH | # OF TIMES TRAVELED TO THE AREA OF **1621 MONTGOMERY** | # OF DAYS TRACKED IN MONTH |
|---|---|---|
| August | 10 | 15 |
| September | 23 | 27 |
| Octobe | 8 | 30 |
| November (1-20) | 9 | 20 |

---

[1] .    These GPS charts contained in this affidavit do not represent all of the information gathered from the tracking device, but only the information necessary to establish probable cause for the locations being searched.

| MONTH | # OF TIMES TRAVELED TO THE AREA OF **3220 GOPHER CANYON** | # OF DAYS TRACKED IN MONTH |
|---|---|---|
| August | 5 | 15 |
| September | 9 | 27 |
| October | 8 | 30 |
| November (1-20) | 12 | 20 |

15.    Venskus also has a 2000 blue-colored Jeep Cherokee bearing California license plate 5NGU289, registered to Venskus at 337 Morgan Place. On August 23 and October 12 and 30, 2007, I observed Venskus' jeep parked in the driveway of **1621 Montgomery Drive**.  On July 23 and October 2, 2007, I observed the Vensku's jeep parked in the driveway of **3220 Gopher Canyon Road**. I conducted physical surveillance on several occasions during this time frame.

16.    On November 8, 2007, a magnetic Global Positioning System (GPS) vehicle tracker was placed on a 2000 Jeep Cherokee bearing California license plate 5NGU289, registered to Venskus at 337 Morgan Place  (hereinafter "Venskus' jeep"). The GPS tracker was placed on Venskus' jeep while it was parked in the drive way of 337 Morgan Place.  Subsequent battery changes of the magnetic GPS vehicle tracker took place while Venskus' jeep was parked in a public place or in the driveway of his residence at 337 Morgan Place.   The GPS tracker on Venskus' jeep shows that Venskus likely resides at 337 Morgan Place because the jeep returns to the address every night.  However, the GPS tracker also shows that Venskus' jeep frequently travels to the area of **1621 Montgomery Drive** and would eventually return to 337 Morgan Place.  When conducting physical surveillance in conjunction  with the GPS tracker I and other agents have observed Venskus driving his jeep.  Below is a chart depicting information received from the GPS tracker on Venskus' jeep demonstrating that he frequently travels to the areas of **1621 Montgomery Drive** as well as **3220 Gopher Canyon Road**:

//

//

6

| MONTH | # OF TIMES TRAVELED TO THE AREA OF **1621 MONTGOMERY** | # OF DAYS TRACKED IN MONTH |
|---|---|---|
| November | 5 | 14 |

| MONTH | # OF TIMES TRAVELED TO THE AREA OF **3220 GOPHER CANYON** | # OF DAYS TRACKED IN MONTH |
|---|---|---|
| November (1-20) | 1 | 14 |

17.    In addition, I believe that Venskus frequents **1621 Montgomery Drive** and **3220 Gopher Canyon Road** properties because in my training and experience, indoor marijuana cultivation operations require regular maintenance to ensure that the marijuana plants are growing healthy and that the equipment (such as lights, fans, irrigation systems, etc.) is operating properly. Some marijuana grows require daily maintenance, while other grows require maintenance 2-3 times each week. If a malfunction occurred with any equipment and the problem was not rectified immediately, it would effect the growth of the marijuana plants resulting in the ultimate loss of product and therefore decreasing the profitability.

18.    Based on my training and experience, it is common for persons who operate clandestine indoor marijuana cultivation operations to reside in a separate residence while maintaining the cultivation operations at other locations. This is done to minimize their involvement in the cultivation operations and insulate themselves if law enforcement discovers the cultivation operation location.

19.    On October 12, 2007, at approximately 11:05 a.m., the GPS tracker indicated Venskus' truck arrived in the area of HydroBrew located at 1319 S. Coast Highway 101, Oceanside, California. HydroBrew has been identified by the DEA as supplying equipment used for the cultivation of marijuana. At 11:10 a.m., a DEA Task Force Agent (TFO) observed Venskus exit HydroBrew carrying a bag of grow rocks and place it in the bed of the pick-up truck, re-enter the store, and exit again with an additional bag of grow rocks and a brown paper bag. Venskus placed the second bag of grow rocks

7

into the bed of the pick-up truck and the brown paper bag into the cab of the truck. Grow rocks are a growing medium used in lieu of dirt commonly used in the cultivation of marijuana. Venskus was subsequently followed by agents directly to **1621 Montgomery Drive**. I believe that Venskus was replenishing supplies needed in the ongoing cultivation of marijuana grow.

20.    On October 30, 2007, at approximately 11:19 a.m., I observed Venskus and another individual, Michael Druker, depart from **1621 Montgomery Drive** in Venskus' Jeep Cherokee. They were followed directly to HydroBrew, both entering the store. Michael Druker exited carrying a box and Venskus exited carrying two brown bags. They were then followed directly back to **1621 Montgomery Drive**.

21.    On November 14, 2007, I applied for and was granted State of California scan warrant #503-07 by San Diego County Superior Court Judge Joel Pressman, authorizing a Forward Looking Infrared (FLIR) scan of **1621 Montgomery Drive**. This device is a passive, non-intrusive system which detects differences in temperature of an object being observed. This system does not send any beams or rays into an area, nor does it enter any structured area. The system only detects differences in the surface temperatures of an object. The use of this device in the early morning or late evening hours, without solar loading (sunshine), will highlight man-made heat sources as a white color and cooler temperatures by shades of gray. Similar devices such as this have been used with other applications such as locating missing persons in a forest, identifying inefficient building insulations, detecting hot overloaded power lines, and detecting forest fire lines through smoke.

22.    On November 15, 2007, pursuant to the state FLIR scan warrant, San Diego Police Officer Kevin Means, who is assigned to the San Diego Police Department's aviation unit as a Tactical Flight Officer (TFO), conducted this FLIR. Officer Means is also a certified thermographer. I have been advised of the qualifications of Officer Means as described in Attachment C, which is filed in

8

conjunction herewith and incorporated by reference herein. After reviewing the video of the FLIR, Officer Means opined there was an area of the roof, in the center of the house, on the backside of the house that was emitting an unusual amount of heat. Warm rooftops are commonly found at indoor marijuana grow houses. Officer Means was not able to detect any other heat anomalies that would indicate the presence of an indoor marijuana grow. Officer Means concluded that the FLIR scan was inconclusive as to the presence of an indoor marijuana grow.

23.      Although the FLIR scan did not detect sufficient heat anomalies associated with indoor marijuana cultivator, it does not preclude the possibility the house is being used to cultivate marijuana especially given the high electricity usage combined with other factors.   Based on my training and experience, marijuana cultivators are often aware of the techniques and tools used by law enforcement to detect their marijuana cultivation operations. They learn these techniques from other marijuana cultivators and trade publications such as "High Times" magazine.   For example, they are told not to discard the unused portions of the marijuana plant in their trash because they know law enforcement conducts trash searches. When purchasing equipment from hydroponic stores, they are told to use different vehicles and not to drive directly back to their marijuana cultivation location because law enforcement conducts surveillance at these hydroponic stores. Likewise, they are also taught ways of defeating the FLIR scans.   For example, marijuana cultivators may operate their heat generating equipment during the day-time hours when FLIR scans can not be used.   Marijuana cultivators can also insulate the rooms that are being used.   They can also direct the venting to other locations, such as a fireplace chimney.

### 3220 GOPHER CANYON ROAD INVESTIGATION

24.      In reviewing the subpoenaed records obtained from SDG&E regarding **1621 Montgomery Drive**, I noticed the prior utility subscriber to Venskus was Michael Druker from October 5, 2005 to April 25, 2007.

25.    The SOI further related that she/he had purchased marijuana from Michael Druker on many occasions but estimated the last purchase was at least a year and a half ago.  During this time frame, Michael Druker told the SOI that he was purchasing indoor grown marijuana from Venskus.

26.    I obtained further subpoenaed records from SDG&E, which revealed that Michael Druker is the current utility subscriber at **3220 Gopher Canyon Road**, since November 17, 2006 to the present.

27.    The following table shows the electrical usage history in kilowatt-hours per month at **3220 Gopher Canyon Road**, along with four comparable neighborhood residences.  I have personally seen these residences used for comparison purposes in the neighborhood and they appear to be similar in size and construction to the residence at **3220 Gopher Canyon Road**.

AMOUNT OF KILOWATTS UTILIZED

| DATE | **3220** **Gopher Can** | XX Gopher Can | XXX Gopher Can | XXX Gopher Can | XXX Gopher Can |
|---|---|---|---|---|---|
| 10/07 | 2697 | 472 | 1592 | 345 | 831 |
| 09/07 | 2398 | 533 | 2321 | 397 | 828 |
| 08/07 | 1935 | 494 | 2707 | 403 | 951 |
| 07/07 | 3644 | 264 | 2278 | 452 | 902 |
| 06/07 | 2084 | 444 | 1511 | 364 | 862 |
| 05/07 | 3224 | 479 | 1562 | 263 | 849 |
| 04/07 | 744 | 714 | 1645 | 300 | 971 |
| 03/07 | 1940 | 575 | 1638 | 304 | 1014 |
| 02/07 | 1777 | 29 | 1602 | 322 | 1206 |
| 01/07 | 1022 | 48 | 1584 | 447 | 1463 |
| 12/06 | 518 | 558 | 1477 | 360 | 1156 |

28.    Based on my training and experience, it is my opinion that the electrical usage at **3220 Gopher Canyon Road** shows excessive energy use that is consistent with the amount of electricity

10

required to operate the equipment commonly used for indoor marijuana cultivation, namely, but not limited to, high wattage lights, circulation fans, exhaust blowers, and pump systems. I observed nothing from the outside of the structure that could lead me to account for the extremely high electrical usage.

29.    On October 17, 2007, a magnetic GPS vehicle tracker was placed on a 1999 Ford F-350 pick-up truck bearing California license plate 7S4520, registered to Michael D. Druker at **1621 Montgomery Drive** (hereinafter "Druker's truck"). The GPS tracker was placed on Michael Druker's truck while it was parked in a public parking lot.  Subsequent battery changes of the magnetic GPS vehicle tracker took place while Michael Druker's truck was parked in a public place or while parked in the drive way of **1621 Montgomery Drive**.  The driveway entrance to **1621 Montgomery Drive** is not gated and there is no signage denoting "no soliciting" or "no trespassing."  Physical surveillance since August 2007 and the GPS tracker on Druker's truck shows that Michael Drukers resides at **3220 Gopher Canyon Road**.  However, the GPS tracker also shows that Michael Druker frequently travels to the area of **1621 Montgomery Drive**.  When conducting physical surveillance in conjunction with the GPS tracker, I and other agents have observed Michael Druker driving his truck.  Below is a chart depicting information received from the GPS tracker on Drukers' truck demonstrating that he frequently travels to the area of **1621 Montgomery Drive**.

| MONTH | # OF TIMES TRAVELED TO THE AREA OF **1621 MONTGOMERY** | # OF DAYS TRACKED IN MONTH |
|---|---|---|
| October | 17 | 14 |
| November (1-20) | 17 | 15 |

30.    On November 14, 2007, I applied for and was granted State of California scan warrant #503-07 by San Diego County Superior Court Judge Joel Pressman, authorizing a Forward Looking Infrared (FLIR) scan of **3220 Gopher Canyon Road**.

31.    On November 15, 2007, pursuant to the state FLIR scan warrant, San Diego Police Officer Kevin Means conducted this FLIR. After reviewing the video of the FLIR, Officer Means opined there was an unusual amount of heat emitting from a window that was located to the right of the front

11

door. There was also an unusual amount of heat emitting from two windows on the backside of the house, directly across from the warm window on the front of the house. Portions of the roof area between the warm windows on both sides of the house were slightly warmer than other areas of the roof. Means concluded that these types of heat anomalies are consistent with venting at an indoor marijuana cultivation operation.

### 10241 EAGLE ROCK AVENUE INVESTIGATION

32.    Referring back to the citizens complaint (as discussed in paragraph 10 of this Affidavit), one of the license plates given to Detective Dinger by the concerned citizen was California license plate number 7H77011. This license plate is assigned to a 2003 Ford pick-up truck registered to Bela R. Bartanyi at **10241 Eagle Rock Avenue**. According to California Department of Motor Vehicles, Bela R. Bartanyi has been the registered owner of that 2003 Ford pick-up since 2004. According to property records, Bartanyi is the owner of **10241 Eagle Rock Avenue**.

33.    SDG&E records reveal Bela Bartanyi is the current utility subscriber **at 10241 Eagle Rock Avenue** since May 23, 2005.

34.    I identified Bela Bartanyi as having a date of birth of May 24, 1966.

35.    A criminal records check of Bela Bartanyi revealed that in 2002, he had been arrested for California Health & Safety Code § 11357(b) - possession of marijuana under an ounce. This charge was dismissed and Bela Bartanyi plead to another unrelated charge.

36.    The following table shows the electrical usage history, in kilowatt-hours per month, at 10241 Eagle Rock Avenue, along with four comparable neighborhood residences. I have personally seen these residences used for comparison purposes in the neighborhood and they appear to be similar in size and construction to the residence at 10241 Eagle Rock Avenue.

### AMOUNT OF KILOWATTS UTILIZED

| DATE | 10241 Eagle Rock | XXX Eagle Rock | XXX Eagle Rock | XXX Eagle Rock | XXX Eagle Rock |
|------|------------------|----------------|----------------|----------------|----------------|
| 10/07 | 1926 | 315 | 473 | 331 | 295 |
| 09/07 | 2079 | 369 | 552 | 605 | 375 |
| 08/07 | 2480 | 378 | 542 | 677 | 345 |

12

| | | | | | |
|---|---|---|---|---|---|
| 07/07 | 2189 | 395 | 446 | 691 | 373 |
| 06/07 | 1848 | 385 | 372 | 657 | 279 |
| 05/07 | 2103 | 422 | 435 | 687 | 303 |
| 04/07 | 1743 | 379 | 400 | 624 | 283 |
| 03/07 | 1999 | 427 | 365 | 620 | 296 |
| 02/07 | 1779 | 460 | 402 | 719 | 326 |
| 01/07 | 2432 | 456 | 404 | 714 | 342 |
| 12/06 | 2247 | 418 | 402 | 770 | 358 |
| 11/06 | 1966 | 421 | 445 | 801 | 386 |

37.     Based on my training and experience, it is my opinion that the electrical usage at **10241 Eagle Rock Avenue** shows excessive energy use that was consistent with the amount of electricity required to operate the equipment commonly used for indoor marijuana cultivation, namely, but not limited to, high wattage lights, circulation fans, exhaust blowers, and pump systems. I observed nothing from the outside of the structure that could lead me to account for the extremely high electrical usage.

38.     On November 14, 2007, I applied for and was granted State of California scan warrant #503-07 by San Diego County Superior Court Judge Joel Pressman, authorizing a Forward Looking Infrared (FLIR) scan of **10241 Eagle Rock Avenue**.

39.     On November 15, 2007, pursuant to the state FLIR scan warrant, San Diego Police Officer Kevin Means conducted this FLIR. After reviewing the video of the FLIR, Officer Means opined that the front half of the house was noticeably warmer than the back half. There was an unusual amount of heat emitting from the vent at the peak of the roof on both sides of the house. There was an unusual amount of heat emitting from the edges of a large vent or skylight, just behind the peak of the roof. Means concluded that these types of heat anomalies to be consistent with that of an indoor marijuana cultivation operation.

### 8539 AQUARIUS DRIVE INVESTIGATION

40.     On October 1, 2007, I followed Bela Bartanyi from his residence, **10241 Eagle Rock Avenue** directly to **8539 Aquarius Drive**. [Agents placed a GPS tracker on Bartanyi's vehicle for a couple of weeks in August 2007 and it was tracked to **8539 Aquarius Drive** on a few occasions.]

13

41.     Based on my training and experience, it is common for people who cultivate marijuana to frequent their friends' clandestine marijuana cultivation operations. They do this for various reasons, such as, but not limited to, helping each other grow the plants, set up equipment, trade or sell marijuana clones, and/or help with electrical problems. In my experience, marijuana growers often have partners in their marijuana grows.

42     I obtained records from SDG&E which revealed that Scott Sharp has been the current utility subscriber at **8539 Aquarius Drive** since August 15, 2006. Scott Sharp previously listed 10228 Eagle Rock Avenue, in 2003, according to California Department of Motor Vehicles records. Scott Sharp currently has three vehicles registered to him at the **8539 Aquarius Drive** address.

43.     The following table shows the electrical usage history, in kilowatt-hours per month, at **8539 Aquarius Drive**, along with four comparable neighborhood residences. I have personally seen these residences used for comparison purposes in the neighborhood and they appear to be similar in size and construction to the residence at **8539 Aquarius Drive**.

| | AMOUNT OF KILOWATTS UTILIZED | | | | | | |
|---|---|---|---|---|---|---|---|
| DATE | **8539 Aquarius** | XXX Aquarius | XXX Aquarius | XXX Aquarius | X Aquarius | X | X |
| 10/07 | 1891 | 529 | 420 | 762 | 611 | | |
| 09/07 | 2125 | 604 | 590 | 944 | 630 | | |
| 08/07 | 1939 | 520 | 503 | 881 | 659 | | |
| 07/07 | 2478 | 514 | 498 | 786 | 556 | | |
| 06/07 | 3196 | 465 | 390 | 910 | 567 | | |
| 05/07 | 1548 | 421 | 360 | 799 | 500 | | |
| 04/07 | 1946 | 415 | 370 | 782 | 450 | | |
| 03/07 | 2515 | 405 | 376 | 767 | 443 | | |
| 02/07 | 3075 | 475 | 453 | 900 | 524 | | |
| 01/07 | 1493 | 386 | 460 | 995 | 504 | | |
| 12/06 | 2486 | 411 | 706 | 1058 | 504 | | |
| 11/06 | 2081 | 390 | 430 | 1059 | 485 | | |

14

44.    Based on my training and experience, it is my opinion that the electrical usage at **8539 Aquarius Drive** shows excessive energy use that was consistent with the amount of electricity required to operate the equipment commonly used for indoor marijuana cultivation, namely, but not limited to, high wattage lights, circulation fans, exhaust blowers, and pump systems. I observed nothing from the outside of the structure that could lead me to account for the extremely high electrical usage.

45.    On November 14, 2007, I applied for and was granted State of California scan warrant #503-07 by San Diego County Superior Court Judge Joel Pressman, authorizing a Forward Looking Infrared (FLIR) scan of **8539 Aquarius Drive**.

46.    On November 15, 2007, pursuant to the state FLIR scan warrant, San Diego Police Officer Kevin Means conducted this FLIR. After reviewing the video of the FLIR, Officer Means opined the front half of the garage was noticeably warmer than the rear half. There was an unusual amount of heat emitting from a vent near the ground at the rear of the garage. Means concluded that these types of heat anomalies are consistent with an indoor marijuana cultivation operation.

### FINANCIAL/EMPLOYMENT BACKGROUND

47.    Subpoenaed records from the California Employment Development Department (EDD) show that:

- Seth Venskus had no wages reported by an employer from the 1st quarter of 2003 to the 1st quarter of 2007. Venskus has not filed for unemployment or disability during this time frame. No other sources of income, except for marijuana cultivation, have been uncovered during the investigation of Venskus.

- Michael Druker had no wages reported by an employer from the 1st quarter of 2003 to the end of the 1st quarter of 2007 for Michael Druker. Michael Druker has not filed for unemployment or disability during this time frame.

- I identified Bela Bartanyi as utilizing social security number 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. EDD has no records for social security number 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.

- Between the second quarter of 2002 to the first quarter of 2007, employers reported Scott Sharp earned only $8,912.56

//

15

48.    During the course of this investigation, I attempted to locate Michael Druker employment history, the California Employment Development Department does not list an employer or that wages were paid to Michael Druker from the first quarter of 2003 to end of the first quarter in 2007. It is my experience that individuals that operate indoor marijuana grow operations do not have legitimate employment, the profits reaped from growing and selling marijuana are enormous and the maintenance that is required to run multiple marijuana grows operation does not allow for an individual to have enough time to work a legitimate full-time job.

50.    I know from prior and recent investigations, that managers of marijuana grow operations make substantial profits from their marijuana grows. In one recent prosecution, a manager of a large marijuana grow operation operated "fictitious" businesses that were designed and set up to launder his substantial drug proceeds. These businesses were set up in order to legitimize drug proceeds and allow the marijuana grower purchase property on obtain loans.  In another prosecution, a manager of a large marijuana grow operation placed his multiple properties in the names of "ficticious" businesses to conceal his assets from the marijuana grows.

51.    A search of Fictitious Business Name filings with the San Diego County Clerks office revealed that Michael Druker registered the factitious business name Ultra Oil for Pets in January 2002. The registration expired in January 2007. Ultra Oil for Pets was a business that was utilized by Damien Andrews to obtain fraudulent bank loans. Damien Andrews plead guilty to manufacturing marijuana plants and money laundering in federal court. In an attempt to legitimize his drug proceeds from marijuana cultivation, Andrews listed his employer as Ultra Oil for Pets on numerous residential loan applications and stated that he made in excess of $100,000 and listed Michael Druker as his supervisor, in some instances.  The evidence showed that Druker was contacted by the lending institutions and Druker would verify information listed on the loan application. During the course of that investigation

it was determined through bank records that Ultra Oil for Pets made a negligible amount of money (under $6,000 total for calendar year 2006). In fact, Andrews utilized the Ultra Oil for Pets business bank account as a personal account. Ultra Oil for Pets was a company that was utilized by Damien Andrews to legitimize his narcotics proceeds to lending institutions.

52.    A review of the website www.pacificacanecorso.com appears that Michael Druker is operating a dog breeding company, his website says. "In 2002/2003 I launched Ultra Oil for Pets..." Druker later claims that he became a dog breeder though his involvement in Ultra Oil for Pets. Druker states that his business is in Bonsall, CA.    A search of the San Diego Assessor's office Ficticious Business names did not reveal a registration for the name Pacifica Cane Corso. A search of the California Secretary of State's corporation and partnership filings also did not reveal any businesses listed under the name Pacifica Cane Corso. The phone number 760-613-5376 that is listed on the website is subscribed to by Michael Druker. I believe that the "Bonsall" location is the **3220 Gopher Canyon Road**, Vista, California. Vista and Bonsall are located adjacent to each other.

53.    A search of Fictitious Business Name filings with the San Diego County Clerks office revealed that Bela Bartanyi registered the factitious business name Bela Bartanyi Home and Land Maintenance in March 2004 and has not expired. Bartanyi list the location and mailing address of Bela Bartanyi Home and Land Maintenance as **10241 Eagle Rock Avenue**, San Diego, California 92126. I have conducted surveillance of Bartanyi on several occasions and have never seen Bartanyi perform and home or land maintenance.

54.    I believe that Druker and Bartanyi established ficticious businesses in an attempt to conceal their true business activity which is growing and selling marijuana. It is my experience that drug traffickers establish a business in order to appear that they are not unemployed, yet accumulating wealth and assets.

**TRAINING AND EXPERIENCE**

55.    Based on my training and experience, I know that persons who are involved in the cultivation of marijuana become involved in the process over an extended period of time because the indoor cultivation and distribution of marijuana is an ongoing process.

56.    I know through my training and experience that indoor marijuana cultivation primarily requires the use of hydroponics equipment such as lava rock in lieu of traditional soil methods. The term hydroponics refers to the cultivation of plants by placing the roots in liquid nutrient solutions rather than soil. To conduct this type of cultivation, the following equipment is required; rockwool also known as GroDan (a fibrous material used as a growing medium and substituted for soil; high intensity lights, nutrients, fertilizers; various types of fans, tables, and trays that are specifically designed to facilitate the irrigation of plants; $CO_2$ enrichment systems; electrical timers, and other items that allow for optimum growing conditions.

57.    I am also aware that indoor cultivators generally utilize a technique known as "cloning" to produce additional plants from clippings from a "mother plant." These clippings are genetically identical to the mother plants. This allows the cultivator to take cuttings from a female plant and ensure the cuttings will develop identical female plants. This type of cultivation produces a seedless marijuana plant known as "Sinsemilla," which has a very high street value and worthy of this expensive investment. In addition, this allows for what is normally an annual plant to be grown year round (three to four crops a year indoors). The cloning process allows for the cultivator to operate on an ongoing basis, capable of producing very high quality marijuana throughout the year. This is further made possible by the utilization of indoor lighting, which, by adjusting the light cycle, allows the cultivator to extend the growing cycle of "mother plants" indefinitely.

58.    The most common method of growing marijuana indoors is by utilizing hydroponics which refers to the growing of plants in nutrient solution with or without an inert medium, to provide mechanical support. This growing medium is often referred to as Grodan or rockwool and is commercially available. Cultivators will take small cuttings (known as clones) from large female marijuana plants and place them into small cubes or rockwool. These clones will be placed in various specially made tables or trays where water, containing all of the vital nutrients that soil normally contains, will saturate the clones. The water is stored in a reservoir and pumped into the trays containing the plants and automatically drains back into the reservoir.

59.    The clones are then placed under high intensity lights ranging from 150 to 400 watts. The lights are generally placed on a timer for 18 hours in a 24-hour period to allow for the plants to acquire a vegetable growth. In approximately 7-10 days the clones will begin to form roots. As the plants continue to grow, a higher intensity light is required to obtain optimum light conditions. Cultivators will use 400 watt and up to 1000 watt lights to provide the plants with enough light to grow

18

as if they were outside. These lights use large quantities of electricity. As an example, each 400 watt light adds approximately $25 and each 1000 watt light adds $54 to monthly utility bills.

60.     These lights are often mounted on a mechanical track which allows the lights to slowly move across the plants providing an equal amount of light to all of the plants. Cultivators have been known to mount a multitude of these lights into an enclosed room. This creates tremendous amounts of heat. In some cases, additional equipment is required such as oscillating fans to cool the room and to exercise the plants. $CO_2$ (carbon dioxide) systems are installed to create optimum air conditions for the plants. The $CO_2$ systems allow for optimum plant development and, when properly installed, cultivators can achieve a significant productivity increase from their plants. Ultimately the cultivators are striving to produce colas, the flowering tops of the marijuana plants where the tetrahydrocannabinol (THC) is mostly concentrated.

61.     In approximately 10 weeks the cultivator will program the lights to be on 12 hours a day, allowing for 12 hours of darkness. The plants are once again tricked into sensing a seasonal change and they will spend 70 percent of their energy into producing colas for the reproduction. Since the plants are never being exposed to male plants, they will not be pollinated and will not produce seeds (hence the term sinsemilla which means "without seeds." The flowering tops of the marijuana plants are known to cultivator as "buds" and are extremely potent in their THC content. The cultivation of indoor marijuana is a very unique process in that it allows for the cultivator to operate on an ongoing basis that yields a very high quality product.

62.     In my experience, documents and business records are frequently maintained by those engaged in the "business" of manufacturing and selling controlled substances. Also, those so engaged will frequently maintain writings, books, business ledgers, lists, notations, and other memoranda to assist them in their criminal enterprises. These materials are created and maintained in much the same way and for the same reasons as persons involved in legitimate business keep similar materials. These documents and business records are frequently kept at the residence that they actually live in. This is done to protect their discovery and seizure by law enforcement if the location being used to cultivate marijuana is raided by law enforcement.

63.     In addition, I believe that there will be evidence of money laundering related to the proceeds of their drug trafficking activities (manufacturing of marijuana plants), in violation of Title 18, United States Code, Section 1956. I know from prior and recent investigations that managers of marijuana grow operations make substantial profits from their marijuana grows. In one recent

19

prosecution, where the manager operated two marijuana grow locations but resided at another location, that manager admitted to making at least $80,000 per month in proceeds from manufacturing marijuana plants.

64.    Internal Revenue Service Special Agent Jamie Harrison has informed me that he has worked as a Special Agent for approximately 7 years. In this capacity, he has conducted numerous financial investigations involving indoor marijuana cultivation, money laundering, bank fraud, and tax evasion. Based on his experience and training, Agent Harrison stated that small businesses, such as those purportedly owned by Druker and Bartanyi, would maintain a number of books and records in order to conduct their business activity and track their finances. Here, Druker and Bartanyi businesses are purportedly based out their residences, I believe records if any of these businesses would be located at **3220 Gopher Canyon Road** (the primary residence of Drucker) and **10241 Eagle Rock Avenue** (primary residence of Bartanyi).

65.    According to Agent Harrison, these books and records would normally include: income tax returns (including Forms 1120, 1120S, 1065, 1040, 940, 941, DE-3); income tax information documents (including Forms 1099, W-2, W-4, K-1), supporting work papers, summary sheets and analyses; documents relating to any corporate audits; corporate journals (including general journals, cash receipts journals, cash disbursement journals, sales journals, purchase journals and payroll journals); general and subsidiary ledgers (including payroll, accounts receivable, accounts payable, purchases); chart of accounts, adjusting and closing entries, year end trial balances, corporate minutes, bylaws and Articles of Incorporation; employee lists and employee contracts; documents showing the receipt or disbursements of cash (including records of royalties, credit card statements and receipts, invoices, records of commercial storage, cash reconciliation's, and records regarding any purchase or sale of assets); loan documents to or from shareholders and related entities with payment history; other loan documents; inventory records; financial statements; contracts (including contract bids and proposals); mortgage records or other documentation supporting conveyances and/or ownership of property; documents and records relating to other corporations, limited liability companies, partnerships and other entities which have related ownership.

67.    IRS Special Agent Jamie Harrison stated that Ultra Oil for Pets, Pacifica Cane Corso, and Bela Bartanyi Homae and Land Maintenance, would also normally maintain records related to their banking activity (including bank statements, check registers, passbooks, deposit and withdrawal slips, cancelled checks, certificates of deposit, notes, account applications, negotiable instruments, safety

20

deposit box records and keys, money drafts, letters of credit, money orders, cashiers' checks and receipts for same, bank checks, wire transfers and bank reconciliations). I believe that any of these items will be found at **3220 Gopher Canyon Road** and **10241 Eagle Rock Avenue.**

68.    Based upon conversations with IRS Special Agent Jamie Harrison, and my t raining and experience, I am aware that owners, managers and operators of businesses keep records at their offices. Here, I believe that they would be found at **3220 Gopher Canyon Road** and **10241 Eagle Rock Avenue** for Druker and Bartanyi, respectively because the GSP tracker (Druker) and physical surveillance (Bartanyi) their vehicles do not travel to an office on a regular basis. These records include various Accounting Journals (e.g., Sales, Purchase, Sales Returns and Allowance, Adjusting Journals) and Business Ledgers (e.g., General, Accounts Payable, Accounts Receivable, Payroll and Subsidiary Ledgers). In addition, I know that businesses also frequently maintain a variety of records to manage their payroll, inventory and tax situation. Similarly, they must also maintain various financial records such as contracts, bank statements, cancelled checks, invoices and sales receipts in order to conduct their normal business activities

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

69.    Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all the facts and opinions set forth in this affidavit, I know that:

a.    Individuals involved in growing/dealing marijuana will often maintain at their residence and other buildings and/or vehicles on their residential property, laboratory equipment, chemicals used to manufacture controlled substances, quantities of controlled substances, as well as paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.

b.    Individuals involved in drug dealing and drug manufacturing often maintain at their residence, and other buildings and/or vehicles on their property, records and ledgers evidencing their trafficking activities in order to keep track of the manufacturing, ordering, purchasing, storage, distribution and transportation of chemical, laboratory equipment and/or drugs. At times, the drugs may be sold, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records are often maintained not only on paper, but also as computer data in the form of computer hardware and software.

21

c.      Individuals involved in drug dealing and drug manufacturing must often rely on others to obtain the drugs and to help them market the drug and evidence of the identities of these criminal associates is often maintained at their residence, and other buildings and/or vehicles on their residential property.

d.      Based on prior searches of premises used by individuals involved in drug dealing and drug manufacturing, I believe I will find articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

e.      Individuals involved in drug dealing and drug manufacturing will often conceal evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers conducting scan warrants at the residence. Therefore, I am requesting permission to scan any vehicle parked at or near the above-described location provided it can be connected to an occupant of the premises by way of admissions, keys, photographs, Department of Motor Vehicles documents, insurance papers, or repair receipts.

f.      Individuals involved in drug dealing and drug manufacturing, earn sums of money and often try to legitimize these profits. In order to do this they attempt to secret, transfer and conceal the money by, among other ways: (1) placing assets in names other then their own to avoid detection while maintaining control; (2) laundering the money through what appears to be a legitimate business or businesses; (3) hiding money in their homes, business locations, safes and safety deposit boxes; or (4) using the money to buy assets which are hard to trace. Records of these transactions are often found at their residence, and other buildings and/or vehicles on their residential property.

g.      Individuals involved in drug dealing or drug manufacturing will often maintain weapons, firearms and ammunition on their person or at their residence and cars in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings. These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs. Therefore, I am requesting permission to seize weapons, firearms and ammunition that may be found at the above-described target location.

70.    It is also my opinion and belief that the above-described documents are currently possessed by drug dealers/manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by drug dealers/manufacturers whether or not the dealer/manufacturer is in

possession of any drugs/chemicals at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the target location despite any lapse of the time between the events described and the anticipated scan pursuant to this warrant.

71.     Based upon the foregoing facts, the affiant has reason to believe that the items identified in Attachment B are located at: (1) **1621 Montgomery Drive**, Vista, California; (2) **3220 Gopher Canyon Road**, Vista, California; (3) **10241 Eagle Rock Avenue**, San Diego, California; (4) **8539 Aquarius Drive, San Diego**, California.

72.     Because this is an ongoing investigation, I request that the affidavit remain sealed under further order of the Court.

John Gieson, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 21st day of November, 2007.

UNITED STATES MAGISTRATE JUDGE

23

## Attachment A

The residence located at **1621 Montgomery Drive, Vista**, is further described as a single-story, single-family residence having gray colored stucco siding with white colored wood trim and having the numbers "1621" on a black mailbox at the end of the driveway on Montgomery Drive



## ATTACHMENT B

1. Documents relating to or memorializing the cultivation and distribution of marijuana, including U.S Currency, buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, ~~computers and computer equipment~~ ~~computer software~~, personal telephone/address books, including electronic organizers, rolodexes, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records.

2. Articles of personal property relating to the existence of a scheme to cultivate and distribute marijuana, including personal telephone/address books, including electronic organizers, telephone bills, photographs, and papers and documents containing lists of names and/or numbers of individuals involved in the possession and sale of marijuana.

3. Documents and articles of property relating to the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, door locks, rental agreements and records, property acquisition records, utility and telephone beepers or paging devices, rolodexes, telephone answering pads, storage records, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit records, canceled checks, and other records of income and expenditure, credit card and bank records, travel documents, personal identification documents, and documents relating to obtaining false identification, including birth certificates, drivers license, immigration cards and other forms of identification in which the same person would use other names and identities other than his or her own.

4. Equipment used to cultivate marijuana, marijuana plants, processed marijuana, as well as paraphernalia for packaging, weighing, cutting, testing, distributing and identifying controlled substances.

5. Weapons and/or firearms.

6. Documents and records including income tax returns (including Forms 1120, 1120S, 1065, 1040, 940, 941, DE-3); income tax information documents (including Forms 1099, W-2, W-4, K-1), supporting work papers, summary sheets and analyses; documents relating to any corporate audits; corporate journals (including general journals, cash receipts journals, cash disbursement journals, sales journals, purchase journals and payroll journals); general and subsidiary ledgers (including payroll, accounts receivable, accounts payable, purchases); chart of accounts, adjusting and closing entries, year end trial balances, corporate minutes, bylaws and Articles of Incorporation; employee lists and employee

contracts; documents showing the receipt or disbursements of cash (including records of royalties, credit card statements and receipts, invoices, records of commercial storage, cash reconciliation's, and records regarding any purchase or sale of assets); loan documents to or from shareholders and related entities with payment history; other loan documents; inventory records; financial statements; contracts (including contract bids and proposals); mortgage records or other documentation supporting conveyances and/or ownership of property; documents and records relating to other corporations, limited liability companies, partnerships and other entities which have related ownership.

7.      Records related to their banking activity (including bank statements, check registers, passbooks, deposit and withdrawal slips, cancelled checks, certificates of deposit, notes, account applications, negotiable instruments, safety deposit box records and keys, money drafts, letters of credit, money orders, cashiers' checks and receipts for same, bank checks, wire transfers and bank reconciliations).

8.      Records include various Accounting Journals (e.g., Sales, Purchase, Sales Returns and Allowance, Adjusting Journals) and Business Ledgers (e.g., General, Accounts Payable, Accounts Receivable, Payroll and Subsidiary Ledgers). In addition, I know that businesses also frequently maintain a variety of records to manage their payroll, inventory and tax situation. Similarly, they must also maintain various financial records such as contracts, bank statements, cancelled checks, invoices and sales receipts in order to conduct their normal business activities.

9.      Records also include audio recordings, video recordings, telephone answering machine recording, memoranda, correspondence, diaries, notes, address books, day planners, calendars, appointment books, newspaper clippings, articles, books, financial institution records, checks, cashiers' checks, money orders, wire transfer records, deposit slips, ATM receipts, certificates of deposit, safety deposit slips, withdrawal slips, monthly and quarterly statements, stock certificates, bonds, bearer instruments, notes, money market account statements, negotiable orders of withdrawal, account documents, letters of credit, passbooks, drafts, title documents, mortgage and loan documents, property records, storage agreements and bills, storage locker keys, vehicle registration and ownership documents, asset ownership records, journals, ledgers, code sheets, financials, budgets, proposals, plans, contracts, agreements, bills of sale, delivery records, invoices, receipts, documentation of conveyances, deeds, and credit card bills and other papers. These records may be in many forms such as paper, electronic, or in code. I know from my experience that businesses use such software as Quickbooks and Microsoft Money to manage their finances and track their investments.

10.     All information to be seized of evidence in violations of Title 21 USC 841(a)(1), 846(a)(1) manufacturing of a controled substance to wit marijuana and marijuana plants and Title 18 USC 1956 money laundering.

**ATTAHCMENT C**
SDPD PO Kevin Means
Training and Experience On Thermal Imaging

1. 26 years with the San Diego Police Department.

2. SDPD Narcotics Investigator for 2 ½ years

3. 18 years as a pilot and Tactical Flight Officer with the San Diego Police Air
   Support Unit.

4. Infrared (FLIR) operator for 16 years.

5. 1993 – Attended DEA/DOJ Thermal Imaging school – Certified
   Thermographer.

6. 1994 – Attended the Law Enforcement Thermographers Association (LETA)
   thermal imaging school.

7. Was certified by LETA as thermal imaging instructor.

8. Authored the POST Certified thermal imaging course entitled "Airborne
   Infrared – Tactics and Operations."

9. Primary instructor for the Airborne Law Enforcement Association (ALEA)
   Airborne Thermal Imaging class since 1996

10. Primary instructor for the ALEA Thermal Imaging Instructor course.

11. Taught airborne imaging to hundred of students throughout the United States
    including; U.S. Customs, U.S. Border Patrol, DEA and dozens of municipal
    law enforcement agencies. Was retained to brief the government of the Dutch
    Antilles on the abilities of airborne thermal imagers.

12. Thermal Imaging instructor for DOJ's Southwest Regionl for law enforcement
    technology.

13. Instructor for the legal portion of the California Highway Patrol (CHP) Post
    Aircrew Course on thermal imaging.

14. Toured the FLIR Systems, Inc. (FSI) factory 4 times in past 10 years.

15. Consulted with FSI and Wescam on the design of airborne thermal inaging systems.

16. Designed and patented an infrared/searchlight slaving system.

17. Authored articles in various law enforcement publications (Law Enforcement Quarterly, AirBeat, etc.) on the abilities and inabilities of thermal imaging.

18. Have performed dozens of thermal scans on suspected indoor grows for agencies throughout San Diego County.